# UNITED STATES DISTRICT COURT

# DISTRICT OF DELAWARE

| | |
|---|---|
| THE ARBITRAGE FUND, on behalf of itself and all others similarly situated,<br><br>                        Plaintiff,<br><br>    vs.<br><br>COLUMBIA PIPELINE GROUP, INC., ROBERT C. SKAGGS, JR., STEPHEN P. SMITH, GLEN L. KETTERING, SIGMUND L. CORNELIUS, MARTY R. KITTRELL, W. LEE NUTTER, DEBORAH S. PARKER, LESTER P. SILVERMAN, and TERESA A. TAYLOR,<br><br>                        Defendants. | **CIVIL ACTION NO.**<br><br><br>CLASS ACTION<br><br><br>**JURY TRIAL DEMANDED** |

# <u>COMPLAINT</u>

Plaintiff The Arbitrage Fund ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases and other public statements issued by Columbia Pipeline Group, Inc. ("Columbia Pipeline" or the "Company"), Columbia Pipeline's filings with the U.S. Securities and Exchange Commission (SEC), media and analyst reports about the Company, newly discovered publicly available evidence in *In re Appraisal of Columbia Pipeline Group, Inc.* Cons. C.A. No. 12736-VCL (Del. Ch.) (the "Appraisal Litigation"), and other public information regarding the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This class action is brought on behalf of all Columbia Pipeline shareholders, except Defendants (defined below) and their affiliates, (i) who held common shares as of May 18, 2016, the record date for Columbia Pipeline shareholders to be eligible to vote on the merger between Columbia Pipeline and TransCanada Corporation ("TransCanada") and (ii) who held common shares through July 1, 2016, the day the merger closed (the "Merger Closing Date") (collectively the "Class Period").  The claims asserted herein are alleged against Columbia Pipeline; Robert C. Skaggs, Jr. ("CEO Skaggs"), Columbia Pipeline's former Chairman and Chief Executive Officer ("CEO"); Stephen P. Smith ("CFO Smith"), Columbia Pipeline's former Chief Financial Officer ("CFO"); Glen L. Kettering, Columbia Pipeline's former President ("President Kettering," together with CEO Skaggs and CFO Smith, the "Executive Officer Defendants"); and the members of Columbia Pipeline's Board of Directors as of the Merger Closing Date: CEO Skaggs, Sigmund L. Cornelius, Marty R. Kittrell, W. Lee Nutter, Deborah S. Parker, Lester P. Silverman, and Teresa A. Taylor (the "Director Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, and for breach of fiduciary duties under Delaware common law.

2.      On July 1, 2015, NiSource, Inc. ("NiSource") separated Columbia Pipeline, a then wholly-owned subsidiary, into a stand-alone publicly traded company (the "Spinoff").  Less than one year after the Spinoff, on March 17, 2016, Columbia Pipeline announced it had entered into an agreement and plan of merger (the "Merger Agreement") to be acquired by TransCanada, pursuant to which Columbia Pipeline shareholders would receive $25.50 per share in cash (the "Merger").  The transaction was valued at $13 billion, including the assumption of Columbia Pipeline debt.

3.      The Merger Agreement was approved and recommended to Columbia Pipeline shareholders by the Company's Board of Directors (the "Board").  In connection with the Merger, the Board was advised by two financial advisors: Goldman, Sachs & Co. ("Goldman") and Lazard Frères & Co. LLC ("Lazard Frères").  On April 8, 2016, the Company filed its preliminary proxy statement with the SEC, and its definitive proxy statement with the SEC (the "Proxy") on May 17, 2016.  On June 22, 2016, the Company's shareholders voted in favor of the Merger.

4.      Unbeknownst to Columbia Pipeline shareholders, the process that led to the Merger was devised by Columbia Pipeline and its executive officers, including the Executive Officer Defendants, to only result in a sale to TransCanada.  Columbia Pipeline did so by using provisions in standstill agreements to stop the bidding process for all current bidders, purportedly so that it could focus on an equity offering to meet the Company's equity financing requirements over the next several years. Notwithstanding the provisions of the standstill agreements, representatives of both Columbia Pipeline and TransCanada met without prior approval of the Board on January 7, 2016 to facilitate TransCanada's continued interest in conducting due diligence and structuring a firm bid for the Company.  During that meeting, CFO Smith advised TransCanada that, "We've eliminated all the competition," apparently referring to the standstill agreements, and listed who those competitors were. About one week after the January 7th meeting, CFO Smith asked Goldman and Lazard Frères to provide due diligence materials to TransCanada, in violation of the standstill agreements and without Board approval.

5.      On March 11, 2016, three days after an exclusivity period with TransCanada ended, a prospective buyer not subject to the standstill agreements approached Columbia Pipeline to discuss a potential acquisition bid.  Rather than negotiate with this new prospective

buyer or use the offer as leverage with TransCanada, CFO Smith refused to negotiate. CFO

Smith also proceeded to advise TransCanada of the emergence of a new bidder, provided a copy

of correspondence rejecting overtures from that party, and agreed to bind the Company to an

exclusivity agreement with TransCanada to prevent the Board from considering any additional

unsolicited interest.  By their acts and inaction, Defendants failed to maximize the value of

Columbia Pipeline shares in the Merger.  The Executive Officer Directors instead worked to

persuade Columbia Pipeline's Board and Columbia Pipeline shareholders to exclude other

prospective buyers from bidding on the Company, to preference TransCanada over other

prospective buyers, and to ultimately accept TransCanada's grossly inadequate $25.50 per share

offer.

6.    Columbia Pipeline and its executive officers, including the Executive Officer

Defendants, also engineered the Spinoff from NiSource and the ultimate sale of the Company to

TransCanada in furtherance of a self-interested plan to cash in on lucrative change-in-control

benefits.  If the assets that would eventually comprise the Company had been sold while those

assets were part of NiSource, the sale would *not* have triggered the Executive Officer

Defendants' change-in-control benefits. However, following the Spinoff, the Executive Officer

Defendants secured new positions at the newly created stand-alone publicly traded Company and

adopted dollar-for-dollar transfers of change-in-control benefits which "flipped in" by the

express terms of the Merger Agreement.

7.    As a result of the Executive Officer Defendants' disloyalty and self-dealing, many

of the representations made to Columbia Pipeline shareholders in the Proxy were materially false

and misleading.  Specifically, the Proxy sought to portray the expressions of interest received

from third-party entities after the Spinoff as unexpected and the bidding process that resulted in the merger price as fairly conducted with all interested bidders on a level playing field.

8.     In particular, the relevant statements in the Proxy (identified in ¶¶ 43-57) were false and misleading because they failed to disclose that Columbia Pipeline and its executive officers: (1) negotiated standstill agreements with prospective buyers which were manipulated to preference TransCanada to the detriment of Columbia Pipeline shareholders and without authorization from the Board; (2) conspired with TransCanada by unilaterally offering it exclusivity and discussing with it eliminating competing bidders; (3) failed to negotiate to maximize the value of Columbia Pipeline shares in the Merger; (4) concealed both TransCanada's prior expressions of interest to purchase the Pre-Spinoff Entities (defined below) directly from NiSource and requests to TransCanada to wait until after the Spinoff so that the Executive Officer Defendants could retire with golden parachutes; (5) conspired to engineer the Spinoff from NiSource and ultimate sale of the Company to TransCanada as part of a self-interested plan to cash in on lucrative change-in-control benefits; and (6) shared a mutual interest with TransCanada to conceal prior efforts to purchase the Columbia Pipeline businesses pre-Spinoff due to a potential tax liability to NiSource which was ultimately passed off to Columbia Pipeline shareholders who held shares as of the effective date of the Merger.  As a result of material misrepresentations and omissions, Columbia Pipeline shareholders were misled into accepting consideration from the Merger that was well below the fair value of their Columbia Pipeline shares.

9.     Accordingly, Plaintiff alleges herein that Defendants violated Sections 14(a) and 20(a) of the Exchange Act by filing false and misleading proxy materials and breached the fiduciary duties they owed to Plaintiff and the Class.

## JURISDICTION AND VENUE

10.     Certain claims asserted herein arise under Sections 14(a) and 20(a) of the

Exchange Act, 15.U.S.C. §§ 78n(a), 78t(a), and Rule 14a-9 promulgated thereunder by the SEC,

17 C.F.R. § 240.14a-9.  This Court has jurisdiction over the subject matter of those claims

pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

This Court has supplemental jurisdiction over the remaining claims asserted herein.

11.     Personal jurisdiction exists over each Defendant either because the Defendant

conducts business in or maintains operations in this District, or is an individual who is either

present in this District for jurisdictional purposes or has sufficient minimum contacts with this

District as to render the exercise of jurisdiction over Defendant by this Court permissible under

traditional notions of fair play and substantial justice. In addition, the Company and

TransCanada submitted themselves to the personal jurisdiction of the State of Delaware under

Section 8.11(b) of the Merger Agreement.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Venue is also proper in the District pursuant to Section

8.09 of the Merger Agreement.

13.     In connection with the acts alleged in this complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications, and the facilities of the national

securities markets.

## PARTIES

14.     Plaintiff The Arbitrage Fund owned shares of Columbia Pipeline stock eligible to

vote on the Merger, as set forth in the attached certification, and suffered damages as a result of

the violations of the federal securities laws alleged herein.

15.     Defendant Columbia Pipeline was a Delaware corporation, created following the Spinoff from NiSource, with its principal executive offices located at 5151 San Felipe Street, Suite 2500, Houston, Texas 77056.  Until the consummation of the Merger and delisting of the Company's common stock from the NYSE, the Company's common stock was listed and actively traded on the NYSE under the ticker symbol "CPGX."

16.     Defendant CEO Skaggs first joined NiSource in 1981, as an attorney for subsidiary Columbia Gas Transmission Corporation.  He served as President and Chief Executive Officer of NiSource from October 26, 2004 to June 2, 2015 and from July 1, 2005 to June 2, 2015, respectively.  Following the Spinoff, CEO Skaggs left NiSource to become Chairman and CEO of Columbia Pipeline.

17.     Defendant CFO Smith first joined NiSource in 1996, as CFO for subsidiary Columbia Gas Transmission Corporation.  Until the Spinoff, CFO Smith served as Executive Vice President and CFO of NiSource from June 2008 to June 2015.  Following the Spinoff, CFO Smith left NiSource to become CFO of Columbia Pipeline.

18.     Defendant President Kettering first joined NiSource's subsidiary Columbia Gas Transmission Corporation in 1979 as an attorney.  President Kettering served as Executive Vice President of NiSource until December 31, 2015.  Following the Spinoff, President Kettering left NiSource to become President of Columbia Pipeline.

19.     Defendant Sigmund L. Cornelius became a Director of Columbia Pipeline in 2015 and served as lead director at the time of the Merger. Prior to the Spinoff from NiSource, he served as a director of NiSource since 2011.

20.     Defendant Marty R. Kittrell became a Director of Columbia Pipeline in 2015. Prior to the Spinoff from NiSource, he served as a director of NiSource since 2007.

21.     Defendant W. Lee Nutter became a Director of Columbia Pipeline in 2015. Prior to the Spinoff from NiSource, he served as a director of NiSource since 2007.

22.     Defendant Deborah S. Parker became a Director of Columbia Pipeline in 2015. Prior to the Spinoff from NiSource, she served as a director of NiSource since 2007.

23.     Defendant Lester P. Silverman became a Director of Columbia Pipeline in 2015.

24.     Defendant Teresa A. Taylor became a Director of Columbia Pipeline in 2015. Prior to the Spinoff from NiSource, she served as a director of NiSource since 2012.

25.     Defendants CEO Skaggs, CFO Smith, and President Kettering are collectively referred to as the "Executive Officer Defendants." Defendants CEO Skaggs, Sigmund L. Cornelius, Marty R. Kittrell, W. Lee Nutter, Deborah S. Parker, Lester P. Silverman, and Teresa A. Taylor are collectively referred to as the "Director Defendants."  Columbia Pipeline, the Executive Officer Defendants, and the Director Defendants are collectively referred to hereinafter as "Defendants."

## SUBSTANTIVE ALLEGATIONS

**A.     Background of the Company and the Spinoff**

26.     NiSource, based in Merrillville, Indiana, is one of the largest natural gas utility companies in the United States, serving nearly 4 million customers in seven states under the Columbia Gas and NIPSCO brands.

27.     CEO Skaggs, CFO Smith, and President Kettering all built their careers at NiSource and spent 30 years, 20 years, and 30 years, respectively, at NiSource and/or its various subsidiaries.  Prior to the Spinoff, the Executive Officer Defendants were executive officers of NiSource, but not of the entities that would become Columbia Pipeline (namely, Columbia Gas Transmission, Columbia Gulf Transmission, Columbia Midstream Group, Columbia Pipeline

Partners, and other natural gas pipeline, storage, and midstream holdings of NiSource (the "Pre-Spinoff Entities")).

28.     At some time prior to the Spinoff, Lazard Frères, Columbia Pipeline's banker, approached TransCanada to discuss TransCanada's interest in the Pre-Spinoff Entities.  Lazard Frères communicated to TransCanada that the Executive Officer Defendants all wanted to retire, that they were proceeding to effect the Spinoff, and that Columbia Pipeline would then be "in play right away."  According to discovery that has emerged in the Appraisal Litigation, in a subsequent email a Lazard Frères banker then communicated to Defendants that "Okay, [the TransCanada's officers] really are interested and they're going to be engaging quickly, but let's not actually talk about a takeover because we don't want to…go over the Reverse Morris Trust rules."  Lazard Frères was referring to a tax-optimization strategy, called a Reverse Morris Trust, that allows for a tax-free transfer of a subsidiary by means of a divisive reorganization (e.g., a spinoff) combined with an acquisitive reorganization (e.g., a statutory merger).  However, Reverse Morris Trust rules provide for a two-year "lookback" period, which blocks pre-spinoff third party prospective buyers from bidding on the post-spinoff company by imposing prohibitive tax liabilities (thereby defeating the purpose of a Reverse Morris Trust: tax-free transfer of the pre-spinoff assets).

29.     On July 1, 2015, NiSource completed the Spinoff, separating the Pre-Spinoff Entities into the stand-alone publicly traded Company, Columbia Pipeline.  The Executive Officer Defendants, all former NiSource executive officers, became executive officers at Columbia Pipeline.  Critically, the Executive Officer Defendants secured dollar-for-dollar transfers of their change-in-control benefits in Columbia Pipeline, even though the Company was much smaller than NiSource.  A sale of the post-Spinoff Company would trigger payment of the

Executive Officer Defendants' change-in-control benefits; funds they would not have otherwise received had they retired directly from NiSource.

### B.    Background of the Merger

30.    Columbia Pipeline received its first indication of interest from a prospective buyer only five days after the Spinoff was completed.  This was just the first inquiry from a prospective buyer Columbia Pipeline received throughout Fall 2015, none of which satisfied the Board.

31.    On July 20, 2015, as restated in the Proxy at p. 34, Party B made a verbal indication of interest in acquiring Columbia Pipeline at a price of $32.50 to $35.50 per share of Columbia Pipeline common stock. CEO Skaggs contacted Party B's CEO to convey that before Columbia Pipeline would be willing to seriously engage with Party B, Party B would need to move to a more attractive price range, which was likely a price per share in the "upper-$30s." On August 12, 2015, Columbia Pipeline and Party B entered into a mutual non-disclosure agreement and Party B began performing due diligence.  Party B withdrew its previous offer on August 31, 2015 due to stock volatility, but did not provide an alternative indicative offer range.

32.    Thereafter and on October 26, 2015, TransCanada Executive Vice President Francois Poirier ("Poirier") and CFO Smith Poirier met for dinner. During their conversation, Poirier indicated that TransCanada was interested in a potential acquisition of Columbia Pipeline. CFO Smith and Poirier had a prior business relationship as a result of Poirier having acted as J.P. Morgan's relationship manager for American Electric Power Co. while CFO Smith was serving as Treasurer of that company. Discussions advanced between the parties and on November 9, TransCanada and Columbia Pipeline entered into a non-disclosure agreement.

33.    On November 2, 2015, CEO Skaggs met with Party B's CEO, who proposed two potential approaches: (i) a joint acquisition of Columbia Pipeline by Party B and Party C, in an all-stock, modified "merger of equals" transaction with a modest premium or (ii) an equity

investment by Party B in certain Columbia Pipeline subsidiaries or joint ventures. Columbia Pipeline was interested in the potential joint acquisition by Party B and Party C and, thus, entered into a mutual non-disclosure agreement with Party C, which allowed for the sharing of information with Party B on November 12, 2015.

34.     On November 11, 2015, Goldman contacted a representative of Party D to informally explore Party D's interest in a private investment in public equity investment in Columbia Pipeline, resulting in the two companies entering into a mutual non-disclosure agreement. On November 24, 2015, TransCanada and Party D each made verbal indications of interest to CEO Skaggs. TransCanada indicated it was interested in pursuing an all-cash acquisition at a price per share of Columbia Pipeline common stock in the range of $25 to $26. Party D indicated that it was interested in acquiring Columbia Pipeline at $23.50 per share of Columbia Pipeline common stock.

35.     Columbia Pipeline's Board stopped the bidding process on November 25, 2015, informing all bidders that it would be conducting a secondary equity offering for general corporate purposes but that the Company had the intention of restarting the sale process once the offering was complete. Under the terms of various non-disclosure and standstill agreements, prospective buyers were required to destroy all due diligence materials and were prohibited from taking any steps towards making any new offers. Indeed, the standstill agreements included a provision that such buyers who signed the agreement were prohibited to request that the Company waive their inability to participate in the bidding process for the Company (the "Don't Ask, Don't Waive" provision). There is no indication that these standstill agreements were dissolved before the announcement of the Merger, making Party B, Party C, Party D, and ostensibly TransCanada, ineligible to bid moving forward.

36.    In a coordinated breach of the standstill agreement, CFO Smith and Poirier had a discussion in December 2015, in which Poirier indicated that TransCanada was considering making a bid for Columbia Pipeline in the range of $28 per share. Then, in January 2016, Poirier met with CFO Smith, again in violation of the standstill agreement and without Board approval, to discuss in greater detail TransCanada's continuing interest in acquiring the Company as well as TransCanada's wish to conduct additional due diligence, all with a view towards making a firm merger proposal for Columbia Pipeline. Their discussion constituted a flagrant violation of the standstill agreements signed by prospective bidders which prohibited the bidder from requesting to amend or waive the standstill agreement.  In this regard, CFO Smith advised TransCanada that, "We've eliminated all the competition," apparently referring to the standstill agreements, and listed who those competitors were.

37.    After the January 2016 meeting, CFO Smith asked Goldman and Lazard Frères to provide access to due diligence materials to TransCanada.  The lead director of Columbia Pipeline's Board has testified in the Appraisal Litigation that "this wasn't a level playing field."

38.    Due to the standstill agreements, TransCanada was the only bidder left in the process. Thus, when TransCanada indicated on January 25, 2016 that it would be interested in pursuing an all-cash acquisition at a price per share in the range of $25 to $28 if Columbia Pipeline were to agree to provide TransCanada with exclusivity, the Company was appearingly free to agree to enter a thirty-day exclusivity agreement beginning on February 1, 2016 and which exclusivity period was eventually extended for an additional eight days. Over the course of that period, TransCanada and the Company negotiated the terms of a merger agreement, with TransCanada's last offer being $25.25 per share of common stock. On March 8, 2016, the

exclusivity period under the exclusivity agreement between Columbia Pipeline and TransCanada expired.

39.    On March 9, 2016, CFO Smith received a call from Poirier, during which Poirier outlined an offer for TransCanada to acquire Columbia Pipeline at a value of $26 per share of Columbia Pipeline common stock, with 10% of the consideration being comprised of TransCanada common stock and the remainder being comprised of cash, and a termination fee of 4.5% of the transaction value. The Board determined that the termination fee was unacceptably high but was willing to continue negotiating with TransCanada.

40.    On March 11, 2016, a prospective buyer not subject to the standstill agreements approached Columbia Pipeline to discuss a potential bid. Rather than negotiate with this new prospective buyer or use the offer as leverage with TransCanada, CFO Smith refused to negotiate. CFO Smith also proceeded to advise TransCanada of the emergence of a new bidder, provided a copy of the correspondence rejecting overtures from that party, and agreed to bind the Company to an exclusivity agreement with TransCanada to prevent the Board from considering any addition unsolicited interest.

41.    Also on March 11, 2016, the Company authorized entry into a new exclusivity period with TransCanada to continue through March 18, 2016.  On the afternoon of March 14, 2016, representatives of TransCanada indicated that their board of directors had approved a final proposal to acquire Columbia Pipeline at a price of $25.50 in cash per share of Columbia Pipeline common stock. On March 15, 2016, TransCanada and the Company reached an agreement on a termination fee of 3% of the equity value of the transaction.

42.    On March 17, 2016, Columbia Pipeline announced it had entered into a definitive agreement to be acquired by TransCanada for $25.50 per share in cash. This represented an

18.9% discount from the closing price for the Company's common stock on its first day of
trading after the Spinoff, just a little more than eight months before the announcement of the
Merger.

       **C.**      **Defendants' Materially False and Misleading Statements**

      43.     On May 17, 2016, the Company filed its definitive Proxy statement, including the
Merger Agreement, with the SEC on Form DEFM14A. The Proxy provided a description of the
proposed Merger, including detailed accounts of the Background of the Merger, the Reasons for
the Merger, as well as the Recommendation of the Board.

      44.     The Proxy states that on October 9, 2015, after a decline in the Company's stock
price, Poirier called CFO Smith "requesting that the two meet for dinner later that month."
Further, the Proxy then states that at a Board meeting on October 19 and 20, 2015, CFO Smith
"mentioned that he would be having dinner the following week" with Poirier and, although
Poirier "had not mentioned discussing a potential transaction, Mr. S. Smith thought it was
possible that the subject could come up." Finally, the Proxy states that at the October 26 meeting
between CFO Smith and Poirier, Poirier "indicated that TransCanada was interested in a
potential acquisition of" Columbia Pipeline.

      45.     The statements set forth in ¶ 44 were materially false and misleading because they
created the impression that TransCanada's interest in acquiring the assets represented by the
Company had just arisen at that time. In particular, the statements failed to disclose that the
Executive Officer Defendants had conspired with TransCanada to conceal TransCanada's prior
expressions of interest in acquiring the Pre-Spinoff Entities directly from NiSource and to
postpone purchase of the Pre-Spinoff Entities. The statements failed to disclose the pre-spin
discussions between Lazard Frères and TransCanada in which Lazard Frères had assured

TransCanada of the Executive Officer Defendants' eagerness to put the Company "in play right away" after the Spinoff.

46.    The Proxy states that on January 7, 2016, pursuant to a request from Poirier, Poirier met with CFO Smith and indicated that "TransCanada was still interested in acquiring [Columbia Pipeline] and wanted to conduct due diligence for 30 to 45 days in order to formulate a firm proposal."  The Proxy further states that *"[u]nlike TransCanada, none of Party B, Party C or Party D sought to re-engage in discussions with [Columbia Pipeline] after discussions were terminated in November 2015*" (emphasis added).

47.    The statements set forth in ¶ 46 were materially false and misleading because they failed to disclose (i) that Parties B, C and D, as well as TransCanada, were subject to standstill agreements *that prevented them from taking any steps toward acquiring the Company*; (ii) the existence and terms of standstill agreements entered into between the Company and particular bidders; and (iii) that at the January 7th meeting, CFO Smith told Poirier that "We've eliminated all of the competition" and identified who those eliminated competitors were.

48.    The Proxy states that in January 2016, CEO Skaggs informed the Board that "TransCanada seemed to be interested in re-engaging with [Columbia Pipeline]" after discussions were terminated in November 2015.  It further states that '[i]n mid-January 2016, TransCanada re-commenced its due diligence investigation of" Columbia Pipeline.

49.    The statements set forth in ¶ 48 were materially false and misleading because they create the false impression that the Board authorized the return of due diligence materials to TransCanada.  However, in the Appraisal Litigation, the lead director of the Board testified that "Wait. I didn't authorize any of this…No, this wasn't a level playing field and [the Board] didn't authorize any of this."

50.     The Proxy states that on March 10, 2016, after the exclusivity agreement between Columbia Pipeline and TransCanada had expired, Poirier, in a conversation with CFO Smith, "requested that [Columbia Pipeline] and TransCanada enter into a new exclusivity agreement granting TransCanada exclusivity for a period of two weeks.  Mr. S. Smith informed Mr. Poirier that [Columbia Pipe's] management would discuss TransCanada's exclusivity request at the next Board meeting."

51.     The statements set forth in ¶ 50 were materially false and misleading because, in fact, the communication between CFO Smith and Poirier relating to a renewal of the exclusivity agreement actually occurred the next day on March 11, after Party A, which was not subject to a standstill agreement, sent an email to CEO Skaggs stating that it was interested in discussions leading to a bid to acquire Columbia Pipeline.  The Appraisal Litigation revealed that CFO Smith wrote to Poirier stating "Hey, this is the message I want to give that rejects the bidder.  Do you want to approve it and would you sign another exclusivity".  *In other words, the Executive Officer Defendants advised TransCanada of a competitive bid, told TransCanada of the Company's intent to reject that offer (without using it as leverage to maximize the ultimate sale price for the Company's shareholders), sought TransCanada's approval of the rejection offer, and, to remove all other competitive bidders, unilaterally offered TransCanada exclusivity without seeking anything in return.*

52.     The Proxy states that on March 11 the Board "authorized entry into a new exclusivity period with TransCanada to continue through March 18, 2016, subject to the Board's evaluation of Party A's inquiry the following morning" on March 12.  The Proxy went on to state that Party A would be submitting a formal written proposal "in the next few days."  However, the Proxy states, on March 16, 2016, just four days later, that the Board determined to reject any

potential offer from Party A, without waiting to be informed of its terms, because, in part, "there was no assurance that Party A would make a formal written proposal in a timely matter [sic] or at all and the fact that the exclusivity agreement prohibited [Columbia Pipeline] from soliciting any such proposal during the exclusivity period."

53.     The statements set forth in ¶ 52 were materially false and misleading because the Executive Officer Defendants had already determined to reject Party A's proposal, even before any discussion with that entity, notwithstanding the terms of the renewed exclusivity agreement with TransCanada.  They had informed TransCanada of that intent, obtained its approval of the rejection message, and unilaterally offered TransCanada exclusivity without obtaining anything in return.

54.     In the "Reasons For The Merger" section, the Proxy purports that "none of Party A, Party B, Party C or Party D would be subject to standstill obligations that would prohibit them from making an unsolicited proposal to the Board following announcement of entry into the merger agreement with TransCanada," ostensibly due to releases provided at that time.  However, while releases from the standstill agreements permitted *post-Merger* agreement offers to the Board, they precluded renewed due diligence which had already been provided to TransCanada giving it an unfair advantage over the "excluded" bidders.  Columbia Pipeline Board's lead director testified in the Appraisal Litigation that this made for *"an uneven playing field."*  In fact, the Proxy failed to disclose that all such parties, save Party A, were subject to a Don't Ask, Don't Waive provision that prohibited them from making a proposal to the Board *before* the merger was announced.

55.     The "Reasons for the Merger" section was also materially false and misleading because it failed to include that a significant reason for the Merger was a self-interested plan by

the Executive Officer Directors to cash in on lucrative change-in-control benefits.  If the assets that would eventually comprise the Company had been sold while those assets were part of NiSource, the sale would *not* have triggered the Executive Officer Defendants' change-in-control benefits. However, following the Spinoff, the Executive Officer Defendants secured new positions at the newly created stand-alone publicly traded Company and adopted dollar-for-dollar transfers of change-in-control benefits which "flipped in" by the express terms of the Merger Agreement. The Executive Directors collectively received $40,424,213 in furtherance of this unlawful event, with CEO Skaggs receiving $23,601,695; CFO Smith receiving $9,553,646; and President Kettering receiving $7,268,872.

56.     In short, the Proxy made statements that were false and misleading because it failed to disclose acts by the Executive Officer Defendants and Director Defendants which failed to maximize the value of Columbia Pipeline shares in the Merger.  The Director Defendants repeatedly violated the standstill agreement with TransCanada to preference them over other prospective buyers. In addition, the Executive Officer Defendants worked to exclude other prospective buyers from bidding on the Company, to preference TransCanada over other prospective buyers, and to ultimately accept TransCanada's meager $25.50 per share offer.

**LOSS CAUSATION**

57.     As described herein, during the Class Period, Defendants made materially false and misleading statements and omissions of material fact, and engaged in a scheme to deceive investors.  Defendants' materially false and misleading statements as set forth above caused Plaintiff and members of the Class to accept Merger consideration that failed to adequately value Columbia Pipeline's shares.  As a result of their possession of Columbia Pipeline common stock during the Class Period, Plaintiff and Class members suffered an economic loss (*i.e.*, damages under the federal securities laws).

## CLASS ACTION ALLEGATIONS

58.    This class action is brought on behalf of all Columbia Pipeline shareholders, except Defendants and their affiliates, (i) who held shares as of May 18, 2016, the record date for Columbia Pipeline shareholders to be eligible to vote on the merger between Columbia Pipeline and TransCanada Corporation and (ii) who held shares through the Merger Closing Date (the "Class").

59.    The Class is so numerous that joinder of all members is impracticable.  As of the close of business on the Columbia Pipeline record date—May 18, 2016— approximately 400,401,454 shares of Columbia Pipeline common stock were outstanding and entitled to vote on the Merger.  Those shares were held by hundreds, if not thousands, of individuals and entities located throughout the country.

60.    Questions of law and fact are common to the Class, including, among others, (i) whether Defendants violated the Exchange Act; (ii) whether Defendants violated Delaware common law; (iii) whether the Executive Officer Defendants and Director Defendants breached their fiduciary duties; and (iv) whether Defendants' conduct irreparably harmed Plaintiff and other members of the Class.

61.    There is a well-defined community of interests in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants violated Delaware common law;

(c)    Whether Defendants omitted and/or misrepresented material facts;

(d)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)     Whether Defendants disregarded that their statements and/or omissions were false and misleading;

(f)     Whether the Executive Officer Defendants have breached their fiduciary duties to the Class;

(g)     Whether the Director Defendants have breached their fiduciary duties to the Class;

(h)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(i)     The extent of damage sustained by Class members and the appropriate measure of damages.

62.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

63.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

64.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

65.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Columbia Pipeline who knew that the statement was false when made.

## COUNT  I

### On Behalf of Plaintiff and the Class Against All Defendants for
### Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

66.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

67.     Defendants disseminated a false and misleading Proxy, which contained statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.

68.     The Proxy was prepared, reviewed, and/or disseminated by the Defendants.  By virtue of their positions within Columbia Pipeline, the Defendants were aware of this information and their duty to disclose this information in the Proxy.

69.     The Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

70.     The omissions and false and misleading statements in the Proxy were material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

71.     The Proxy was an essential link in causing Columbia Pipeline shareholders to approve the Merger.

72.     By reason of the foregoing, the Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

73.     Because of the false and misleading statements in the Proxy, Plaintiff and the Class were harmed.

## COUNT  II

**On Behalf of Plaintiff and the Class Against the Executive Officer Defendants and Director Defendants for Violations of Section 20(a) of the Exchange Act**

74.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.     The Executive Officer Defendants and Director Defendants (collectively, the "Controller Defendants") acted as controlling persons of Columbia Pipeline within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions and participation in and/or awareness of Columbia Pipeline's operations and/or intimate knowledge of the false and misleading statements contained in the Proxy filed with the SEC, the 20(a) Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of Columbia Pipeline, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

76.     The Controller Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     In particular, each of the Controller Defendants had direct and supervisory involvement in the day-to-day operations of Columbia Pipeline, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The misrepresented information identified above was reviewed by the Director Defendants prior to voting on the Merger.  The Proxy at issue contains the unanimous recommendation of the Director Defendants to approve the Merger. The Controller Defendants were thus directly involved in the making of the Proxy.

78.     In addition, as the Proxy sets forth at length, and as described herein, the Controller Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Controller Defendants reviewed and considered.  The Executive Officer Defendants participated in drafting and/or gave their input on the content of those descriptions.

79.     By virtue of the foregoing, the Controller Defendants have violated Section 20(a) of the Exchange Act.

80.     As set forth above, the Controller Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Controller Defendants are liable pursuant to Section 20(a) of the

Exchange Act.  As a direct and proximate result of the Controller Defendants' conduct, Plaintiff and the Class were irreparably harmed.

## COUNT  III

**Breach of Fiduciary Duty Against the
Executive Officer Defendants and Director Defendants
(In Their Capacities as Officers and Directors of the Company)**

81.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

82.    CEO Skaggs, CFO Smith, and President Kettering, as officers of Columbia Pipeline, and CEO Skaggs, Sigmund L. Cornelius, Marty R. Kittrell, W. Lee Nutter, Deborah S. Parker, Lester P. Silverman, and Teresa A. Taylor, as directors of Columbia Pipeline, owe Plaintiff and the Class the fiduciary duties of loyalty, care, and good faith.

83.    The Director Defendants breached their fiduciary duties by entering into standstill agreements with "Don't Ask, Don't Waive" provisions, as well as a no-solicitation provision in the merger agreement. These provisions made them willfully ignorant of potential better offers for the Company.

84.    The Executive Officer Defendants engaged in self-dealing by preempting the Merger with the Spinoff in order to secure dollar-for-dollar transfers of their change-in-control benefits to Columbia Pipeline. The Executive Officer Defendants would not have otherwise received these benefits if they had retired directly from NiSource, despite the Company being significantly smaller than NiSource.

85.    In addition, the Executive Officer Defendants blocked certain bidders from participating in the process and gave TransCanada significant advantages in the processing causing the ultimate deal price to be considerably smaller than it could have been if a fair process

had occurred.  The Executive Officer Defendants acted without the approval of Columbia Pipeline's Board of Directors.

86.    As a direct and proximate result of the Executive Officer Defendants and Director Defendants' breach of their fiduciary duties, Plaintiff and the Class have sustained significant monetary damages and were irreparably harmed.

87.    As a result of the misconduct alleged herein, both before and after the record date, the Executive Officer Defendants and Director Defendants are liable to Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre and post-judgment interest thereon;

C.    Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

D.    Declaring that the Executive Officer Defendants and Director Defendants have breached their fiduciary duties to Plaintiff and the Class;

E.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: June 8, 2018                       Respectfully submitted,

                               By:    */s/ Brian E. Farnan*_____
                                      Sue L. Robinson (Bar No. 100658)
                                      Brian E. Farnan (Bar No. 4089)
                                      Michael J. Farnan (Bar No. 5165)
                                      **FARNAN LLP**
                                      919 North Market Street, 12th Floor
                                      Wilmington, DE 19801
                                      Telephone: (302) 777-0336
                                      Facsimile: (302) 777-0301
                                      Email: srobinson@farnanlaw.com
                                             bfarnan@farnanlaw.com
                                             mfarnan@farnanlaw.com

                                      *Plaintiff's Delaware Liaison Counsel*

                                      Vincent R. Cappucci
                                      Jessica A. Margulis
                                      **ENTWISTLE & CAPPUCCI LLP**
                                      299 Park Avenue, 20th Floor
                                      New York, New York 10017
                                      Telephone: (212) 894-7200
                                      Facsimile: (212) 894-7272
                                      Emails:  vcappucci@entwistle-law.com
                                             jmargulis@entwistle-law.com

                                      *Lead Counsel for Plaintiff The Arbitrage Fund*